### In re: LUPRON® MARKETING AND SALES PRACTICES LITIGATION

### No. MDL.1430, 01–CV–10861–RGS.

United States District Court,
D. Massachusetts.

Nov. 25, 2003.

Deborah S. Birnbach, Joseph F. Savage, Jr., Testa, Hurwitz & Thibeault, LLP, Boston, MA, for TAP Pharmaceutical Products, Inc., Defendant.

Daniel A. Curto, Donald R. Frederico, McDermott, Will & Emery, Boston, MA, for Abbott Laboratories, Defendant.

Michael J. Flannery, The David Danis Law Firm, P.C., St. Louis, MO, Jeffrey L. Kodroff, Spector & Roseman, Philadelphia, PA, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, Thomas M. Sobol, Hagens Berman, Boston, MA, for William M. Porter, Plaintiff.

Martin F. Murphy, Rheba Rutkowski, Fiona S. Trevelyan, Bingham McCutchen LLP, Boston, MA, for Takeda Chemical Industries, Defendant.

*MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND SECOND AMENDED CONSOLIDATED COMPLAINT*[1]

STEARNS, District Judge.

Plaintiffs, who are cancer patients and health care plans, accuse defendants Abbott Laboratories (Abbott), Takeda Chemical Industries, Ltd. (Takeda), and TAP Pharmaceutical Products, Inc. (TAP) of conspiring to artificially inflate the price of the drug Lupron® in violation of the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962.[2] The class action plaintiffs consist of a commercial health insurance carrier (Beacon Health Plan), an ERISA plan (Twin Cities Bakery Workers Health and Welfare Fund), and four patients who paid for all or part of a Lupron® injection. The class action cases were consolidated in this court by the Multi–District Litigation Panel (MDLP). A coalition of Blue Cross/ Blue Shield Plans,[3] which filed two Lupron®-related non-class action cases in the District of Massachusetts then agreed to coordinate pretrial proceedings with the class action plaintiffs, as did the non-class action plaintiff Cobalt Corporation. The plaintiffs collectively seek to recover from the defendants the alleged overcharges for Lupron® as well as punitive damages. Defendants, challenging the legal sufficiency of the plaintiffs' claims, move to dismiss the combined actions in their entirety.[4]

### BACKGROUND

The background is summarized from the court's decision in *Lupron Marketing and Sales Practices Lit.*, 245 F.Supp.2d at 283–285. Abbott is a major American pharmaceutical company based in Illinois. Takeda is Japan's largest drug manufacturer. Takeda produces Lupron® (leuprolide acetate), a testosterone suppressor used pri-

---

1. The court previously rejected Takeda's motion to dismiss for want of personal jurisdiction. While the court agreed with Takeda that plaintiffs had failed to establish specific jurisdiction, it held that Takeda was subject to general jurisdiction under the "doing business" test of the Illinois Long–Arm Statute, 735 Ill. Comp. Stat. § 5/2–209(b)(4). *See In re Lupron Marketing and Sales Practices Lit.*, 245 F.Supp.2d 280, 295–297 (D.Mass.2003).

2. Plaintiffs also assert claims under various state consumer protection statutes as well as claims of common-law fraud and unjust enrichment.

3. The Blue Cross/Blue Shield plaintiffs will be referred to familiarly as the "Blues plaintiffs" in this opinion.

4. The Blues' Second Amended Consolidated Complaint (Consolidated Complaint) largely tracks the class action plaintiffs' Corrected Consolidated Amended Class Action Complaint (Class Action Complaint). Factual allegations have been drawn from both the Consolidated Complaint and the Class Action Complaint. I have used the term "Amended Complaint" to refer collectively to the identical legal theories contained in both Complaints. Counts are discussed using the structure and numbering of the Consolidated Complaint. The term plaintiff includes the class action plaintiffs and the Blues plaintiffs unless otherwise indicated.

marily to treat male prostrate cancer, but also endometriosis, central precocious puberty, and uterine fibroid preoperative anemia. Lupron® is administered by intramuscular injection, typically by a patient's doctor or by a nurse working under the doctor's supervision. Lupron® is distributed in the United States by TAP, an Illinois corporation jointly owned by Takeda and Abbott.

On October 16, 2001, TAP plead guilty to violating the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t), 333(b).[5] TAP admitted that it had encouraged doctors to falsely bill Medicare for free samples of Lupron® as part of a scheme to induce doctors to prescribe Lupron®. TAP was ordered to pay a criminal fine of $290 million. As part of a civil settlement, TAP agreed to pay $559,483,560 in restitution to the United States for losses incurred by Medicare and $25,516,440 in restitution for losses incurred by state Medicaid programs.

Medicare was created in 1965 by Congress to provide medical insurance to senior citizens (ages 65 and older). *See* 42 U.S.C. §§ 1395—1395ggg. Medicare is overseen by the Secretary of Health and Human Services (HHS) and is administered by the Centers for Medicare and Medicaid Services (formerly the Health Care Financing Administration [HCFA]). Medicare Part B pays for a number of

medical services, including the cost of certain prescription drugs. While Medicare Part B does not for the most part pay for self-administered drugs, it does pay providers for up to 80% of the "allowable cost" of physician-injected drugs like Lupron®. The remaining 20% is paid by the Medicare beneficiary as a "co-payment."[6]

"Allowable cost" was defined by HHS regulations until 1998 as the lesser of a drug's estimated actual acquisition cost or its national average wholesale price (AWP). 42 C.F.R. § 405.517.[7] Medicare administrators historically relied on the AWP in setting the reimbursement rate for Lupron®. The AWP in turn was derived by HHS from the *Drug Topics Red Book (Red Book)*, an industry publication compiling wholesale drug prices. The AWP for Lupron® as it appeared in the *Red Book* was supplied by TAP. No independent verification of the actual AWP was undertaken by Medicare or by the *Red Book* itself. The published AWP for Lupron® as reported by TAP ranged from $418.75 in 1992 to $623.79 in 2001.[8]

After TAP's guilty plea, putative class actions were brought in various courts on behalf of co-paying beneficiaries, direct purchasers of Lupron®, and private health care plans who were not part of the civil settlement negotiated by the United States. The actions pending in the federal district court were consolidated by the

5. Following TAP's plea, an indictment was unsealed against six present and former TAP employees and a Massachusetts urologist, alleging a criminal conspiracy to defraud the federal Medicare program. Several other urologists were charged in criminal informations.

6. Beneficiaries are required to pay an annual deductible before Part B benefits become available. Some Part B participants purchase "Medigap" insurance from the Blues plaintiffs to cover all or part of the co-payment.

7. On January 1, 1998, in response to a directive in the Balanced Budget Act of 1997, HCFA amended 42 C.F.R. § 405.517 to redefine the allowable cost as the lower of the actual Medicare billing or 95% of the AWP.

8. Despite the published AWPs, the Amended Complaint alleges that the actual cost of Lupron® to doctors declined from $340 in 1993 to $207 in 1999. Consolidated Complaint at ¶ 8.

MDLP in the District of Massachusetts for pretrial proceedings.[9] In addition, two cases filed on behalf of the Blues in the District of Massachusetts were joined as related cases.[10]

### THE AMENDED COMPLAINT

Plaintiffs' core allegation is that the AWPs for Lupron® reported by the defendants bore no resemblance to the actual prices charged by TAP to doctors, nor did they bear any relationship to a reasonable interpretation of the terms "average" or "wholesale." The AWPs rather were deliberately inflated as part of an improper marketing and sales scheme to promote Lupron® at plaintiffs' expense by funneling hidden profits to doctors. As summarized in the Consolidated Complaint:

> [t]he improper marketing and sales practices include[d], *inter alia:* (a) deliberately and falsely overstating the [AWP] for Lupron®, the rate upon which Medicare and private health insurance reimbursement rates are set, so that Medicare, Medicare beneficiaries and the [health care] Plans paid artificially inflated prices for Lupron®; (b) providing free samples of Lupron® to medical providers and instructing them

that they could and should bill Medicare and third-party payers for the free samples with the intent that they do so; (c) providing other unlawful financial inducements and hidden price discounts to medical providers to prescribe Lupron®, causing the Plans to pay the artificially inflated price for Lupron®; and (d) actively concealing and causing others to conceal, information about the true price being charged for Lupron®.

Id. ¶ 4.[11]

Central to the factual allegations of the Amended Complaint is TAP's concession that its sales representatives had distributed some $31 million in "free" Lupron® samples between 1993 and 1999.[12] TAP's president, Thomas Watkins, admitted

> that TAP provided free samples of Lupron® to a number of physicians, primarily in the early to mid–1990s, with the knowledge that those physicians would seek and receive reimbursement. The billing for free samples is wrong, and it should never have happened.

Class Action Complaint ¶ 83. Dr. Joel Olstein, a urologist in Lewiston, Maine, stated that TAP had presented him with a free sample of Lupron® every time that he

---

9. The lead plaintiffs in six of these cases are named as plaintiffs in the Class Action Complaint. The six cases are: *Russano v. TAP Pharmaceutical Products, Inc.* (N.D.Ill.C.A. No. 01–6982); *Goetting v. TAP Pharmaceutical Products, Inc.* (S.D.Ill.C.A. No. 01–703); *Porter v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 01–10861); *Beacon Health Plans, Inc. v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 01–10897); *Brickey v. TAP Pharmaceutical Products, Inc.* (N.D.Ala. C.A.No.01–2770); and *Twin Cities Bakery Workers Health and Welfare Fund v. TAP Pharmaceutical Products, Inc.* (D.Minn.C.A. No. 01–2023).

10. The Blues cases are *Empire Healthchoice, Inc., d/b/a/ Empire Blue Cross and Blue Shield v. TAP Pharmaceutical Products, Inc.* (D.Mass.

C.A.02–10015) and *Blue Cross and Blue Shield of Florida, Inc. v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A.02–10139). On January 14, 2003, the court approved a stipulation adding Oxford Health Plans, Inc., and Horizon Healthcare Services, Inc., as parties to the Consolidated Complaint.

11. The class action plaintiffs limn the same elements of the scheme, emphasizing the injury to the members of the proposed class, including private purchasers of Lupron® and co-paying Medicare beneficiaries.

12. The Massachusetts U.S. Attorney estimated that the AWP billings to Medicare for these free samples ranged between $31 million and $61 million. Government's TAP Sentencing Memorandum, at 20–22.

started a new patient on the drug. "They wanted me to carefully track how many new patients I started on Lupron® and we kept lists. Anybody in practice knows how to bill for free samples." *Id.* at ¶ 95.

Plaintiffs allege that defendants offered other undisclosed financial inducements to doctors to stimulate the sales of Lupron®, including volume discounts, rebates, purported "education" grants, junkets, off-invoice pricing, free goods, credit memos, consulting fees and debt forgiveness. In 1996, the Tufts Health Maintenance Organization decided to switch its prostate cancer patients from Lupron® to a less costly competitor drug, Zoladex®. In response, TAP's national accounts manager, Janice Swirski, told Tufts that TAP could not make any further reduction in the price charged to Tufts, as that would affect the price TAP charged the federal government for Lupron®. Instead, TAP offered Tufts unrestricted "educational grants" of up to $25,000 per year if Tufts would continue to prescribe Lupron® to patients. Tufts declined TAP's offer.

TAP also forgave debt as a disguised form of illegal discounting. One urology practice in Boston had $11,000 of prior Lupron® debt cancelled in exchange for switching all of its patients from Zoladex® to Lupron®. In 1995, Kimberlee Chase, a TAP sales representative discharged $ 13,-000 of Lupron® debt owed by a urology practice in Fall River, Massachusetts, when the group (which owed TAP in excess of $70,000) threatened to switch its patients from Lupron® to Zoladex®.

Under the guise of business review meetings, TAP devised a so-called "Return to Practice" program to demonstrate how doctors could profit from the spread between the AWP for Lupron® and the actual price that they would be charged for the drug. In one case, a TAP employee left a spread sheet with a Massachusetts urolo-gist who had switched to the less costly Zoladex® showing an additional profit of $7,000 that the doctor could earn by billing the AWP for Lupron®. On another occasion, TAP executives increased the AWP for Lupron® to counter an announced rise in the AWP for Zoladex®.

TAP sales representatives routinely counseled doctors to conceal from patients, insurance carriers, Medicare, and other doctors, the actual price that they paid for Lupron®. Alan Mackenzie, a senior TAP marketing executive, instructed his sales force to caution doctors "that if [they] disclosed their invoice costs to the Medicare Program, that Program would take steps to reduce the maximum payment allowed for Lupron® and thus reduce [their] profit for Return to Practice." Class Action Complaint at ¶ 112. He further told his sales people to warn doctors that "by discussing your costs of Lupron® with other physicians, you run the risk of that information getting back to [HHS]. If [HHS] then realizes that AWP is not a true reflection of the price, the AWP could be affected, thus lowering the amounts you may charge." *Id.* The only pricing information for Lupron® that TAP publicly disclosed was the inflated AWP.

## DISCUSSION

### The Standard of Review

When reviewing a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company,* 14 F.3d 697, 700 (1st Cir.1994). All reasonable inferences permitted by the factual averments of the complaint are to be drawn in plaintiffs' favor. *Garita Hotel Ltd. P'ship*

*v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir.1992).

### Political Question

■ Defendants argue as a preliminary matter that the Amended Complaint should be dismissed under the political question doctrine for lack of justiciability. As explained by Justice Brennan in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962),

[p]rominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. 691 (numbering inserted).

Defendants argue that the fourth of Justice Brennan's categories (disrespect for decisions taken by the coordinate branches) is implicated by the Amended Complaint. Defendants maintain that Congress has spent decades wrestling over the cost structure of the Medicare program and, despite being aware of the fact that the AWP for most prescription drugs does not reflect their actual cost, "has repeatedly, consciously, and intentionally left the current system in place, leading to the inescapable conclusion that Congress intends AWP to be higher than the cost charged to providers." Defendant's Memorandum, at 31. Defendants accuse plaintiffs of now attempting an "end run around the political system" by trying to accomplish in the courts what they have failed to obtain in the political process. For the court to intervene and "second-guess" the decisions of Congress and the HHS regulators would, in the eyes of defendants, "be inappropriate and inadvisable." [13] *Id.* at 32.

■ While an elegant doctrine, political question considerations have generally led to judicial abstention only in sensitive matters relating to national defense and only then in the rarest of cases. As Professor Tribe notes, the Supreme Court has invoked the political question doctrine only twice since *Baker v. Carr* to hold an issue nonjusticiable.[14] *See Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (declining to evaluate the training of the Ohio National Guard); *Nixon v. United States*, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (declining to entertain a challenge to the Senate's "sole authority" to determine impeachment trial procedures). Mere disagreement with a deter-

---

**13.** Defendants also argue that the second of the categories (lack of manageable standards) is also at play as the court without direction from Congress "would have to step into the political arena and make policy decisions about the Medicare payment level for covered pharmaceuticals." *Id.* at 32. This argument seems somewhat overblown. As I understand the Amended Complaint, plaintiffs are not asking the court to determine the appropriate AWP for Lupron®. Rather, they are seeking to recoup the difference between what they paid for Lupron® as a result of the listed AWP and the actual price paid by doctors for the drug, a figure reasonably ascertainable by the plaintiffs without the help of the court.

**14.** 1 L.H. Tribe, *American Constitutional Law* 376 (3d ed.2000).

mination by Congress, even one with constitutional dimensions, is not normally a reason for a court to abstain on justiciability grounds. As Justice Marshall observed in *United States v. Munoz–Flores*, 495 U.S. 385, 390, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990), a case involving a challenged violation of the Origination Clause, "[t]he Government may be right that a judicial finding that Congress has passed an unconstitutional law might in some sense be said to entail a 'lack of respect' for Congress' judgment. But disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question. If it were, *every* judicial resolution of a constitutional challenge to a congressional enactment would be impermissible."

■ Moreover, I do not agree with the premise of defendants' argument that a judicial resolution of this case would entail any disrespect to the intent of Congress in structuring prescription drug reimbursement rates using the AWP as a benchmark. As defendants portray the Congressional purpose in setting the reimbursement rate at 95% of AWP, Congress meant to turn a blind eye to the inflated AWPs as a means of enticing physicians to treat Medicare patients. In other words, Congress deliberately invited the very fraud of which defendants are accused. As defendants describe it, "a determination that AWP must be set at the

actual cost to providers would result in lower Medicare payment levels to physicians, prompting many of those physicians to stop treating Medicare patients because it is not cost-effective for them to do so." Defendants' Memorandum, at 32. The suggestion that Congress would deliberately condone a bribery scheme using public funds to enrich drug manufacturers and physicians is, to say the least, unusual.[15] It is far more likely that by setting the Medicare reimbursement rate below the AWP, Congress took a tentative step towards using Medicare's purchasing power as a means of driving down the cost of prescription drugs to the Medicare program. "Average," after all, means that in a competitive market, some prices will be higher and some lower than the median. Congress might reasonably have wished to put Medicare on the lower rung of the equation.[16]

### The RICO Claims

■ A successful civil RICO action requires proof of four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). An enterprise may be a legal entity like a business, a governmental unit, or a union, or it may be an informal grouping of individuals associated in fact. *United States v.*

---

**15.** If this were Congress's purpose, one would think it would have been more effective to simply bribe doctors directly without offering drug companies a cut. On the larger issue, I do not understand why a doctor, who is being paid to administer a drug to a patient, is entitled to earn a profit on the drug he injects. A doctor does not earn a commission (or so one hopes) on a drug that he prescribes.

**16.** Defendants also assert that plaintiffs' claims are barred by the filed rate doctrine. The doctrine has several permutations but is usually held to prohibit a regulated entity from charging rates for its services "other

than those properly filed with the appropriate regulatory authority." *See Sithe New England Holdings, LLC v. Federal Energy Regulatory Commission*, 308 F.3d 71, 77–78 n. 3 (1st Cir.2002). Defendants interpret the doctrine in a more narrow sense to preclude a judicial attack on a filed and approved tariff. The short answer to this argument is that (1) drug manufacturers are not regulated entities within the meaning of the doctrine, (2) the AWP is not a tariff filed with any regulatory agency, and (3) there is no formal regulatory approval of the AWP.

*Turkette,* 452 U.S. 576, 580–581, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). An enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 583, 101 S.Ct. 2524. *See also Libertad v. Welch,* 53 F.3d 428, 442 (1st Cir.1995) ("[I]t is not sufficient that several organized, ongoing groups come together for one concerted action, unless those groups can also be shown to constitute a larger unit, over and above their separate structures and operations."). The enterprise itself, however corrupt or corrupted, cannot itself be a RICO defendant. "The person or persons alleged to be engaged in racketeering activity must be entities distinct from the enterprise." *Odishelidze v. Aetna Life & Casualty Co.,* 853 F.2d 21, 23 (1st Cir. 1988) (per curiam) (a business and its employees could not do double duty as the enterprise and as the RICO persons). The inverse is also true. *See Doyle v. Hasbro, Inc.,* 103 F.3d 186, 191 (1st Cir. 1996) ("The ... failure to identify any enterprise, distinct from a named person defendant, is fatal under RICO."). To conduct or participate, directly or indirectly, in the affairs of an enterprise requires a showing that a defendant took "*some* part in directing the enterprise's affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). "Pattern of racketeering activity" means the commission of at least two related acts of racketeering activity during a span of ten years. *See Schultz v. Rhode Island Hospital Trust National Bank, N.A.,* 94 F.3d 721, 731–732 (1st Cir.1996). To demonstrate relatedness, the predicate acts must have the same or similar purposes, participants, victims, or methods, or otherwise be interrelated by distinguishing characteristics and not be isolated events. *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 44 (1st Cir.1991). The plaintiff must demonstrate that the predicate acts amount to or pose a threat of continued criminal activity. *Efron v. Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 15 (1st Cir.2000). There must also be evidence of "continuity" sufficient to show that the predicate acts constituted a "pattern," that is, a "closed period of repeated conduct" or "a regular way of conducting the enterprise." *Aetna Casualty Surety Co. v. P & B Autobody,* 43 F.3d 1546, 1561 (1st Cir.1994). *Cf. Roeder v. Alpha Indus. Inc.,* 814 F.2d 22, 30 (1st Cir.1987) (acts do not constitute a pattern "simply because they number two or more."). *See Soto–Negron v. Taber Partners I,* 339 F.3d 35, 38–39 (1st Cir.2003) (four criminal acts within a five-day period did not satisfy the continuity requirement). Predicate acts must be plead with particularity. *Ahmed v. Rosenblatt,* 118 F.3d 886, 889 (1st Cir. 1997). To have standing under RICO, a plaintiff must show that a predicate act caused an injury to business or property. *Welch,* 53 F.3d at 436. *See DeMauro v. DeMauro,* 115 F.3d 94, 97 (1st Cir.1997) (the claimed injury must not be too speculative). The predicate act must be more than a "cause in fact" of a plaintiff's injury; it must be the proximate cause. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 266 n. 11, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). *See also Camelio v. American Federation,* 137 F.3d 666, 669 (1st Cir.1998).

*Plaintiffs' RICO Theories*

Count I, which plaintiffs label the "Tap Enterprise," alleges that Abbott and Takeda, as "persons" within the meaning of 18 U.S.C. § 1962(c), conducted the affairs of TAP, the "enterprise," through a pattern of racketeering activity consisting of predicate acts of mail and wire fraud. Under this theory, Abbott and Takeda were the decision-makers who jointly determined

the price at which Lupron® would be sold by TAP to medical providers as well as the AWP that determined the ultimate cost of the drug to plaintiffs. Abbott and Takeda are also alleged to have directly controlled the marketing of Lupron® by TAP and to have implemented the scheme to distribute free samples of Lupron®. Count II proposes a variant of Count I in which TAP, Abbott, and Takeda (as "persons") conducted the same racketeering activity through an association-in-fact (the "enterprise") consisting of themselves and their agents and employees. Count III expands the association-in-fact to include all of the physicians in the United States who participated in the Lupron® marketing scheme. Finally, Count IV alleges that Abbott, Takeda, and TAP conspired to commit RICO offenses in violation of section 1962(d) of the statute.

Defendants' joint motion to dismiss maintains that the Amended Complaint fails to plead with sufficient specificity facts establishing the necessary predicate acts, the existence of a viable enterprise, causation, and detrimental reliance. I will discuss each of these arguments in the sequence in which they are raised.

### Racketeering Acts

■ Without viable predicate acts a RICO claim collapses. *Ahmed,* 118 F.3d at 888. The predicate acts alleged by plaintiffs consist of the numerous mailings and electronic communications sent by the defendants to medical providers in furtherance of the Lupron® marketing scheme. Mail and wire fraud requires proof that (1) defendants knowingly devised or participated in a scheme to defraud, (2) to obtain money or property by means of false or fraudulent pretenses, representations and promises, and (3) that the mails or interstate wire facilities were used in carrying out the scheme. *Neder v. United States,*

527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The use of the mails (or the wires) need not be essential to the scheme to defraud, or even done by a defendant, so long as the mailing is a closely related and reasonably foreseeable incident of the scheme. *United States v. Morrow,* 39 F.3d 1228, 1236–1237 (1st Cir.1994). *See also Schmuck v. United States,* 489 U.S. 705, 710–711, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989).

■ Fraud is a concept which by "universal recognition ... is to be construed very broadly." 2 Sand Siffert, Loughlin & Reiss, *Modern Federal Jury Instructions* ¶ 44.01, at 44–11 (2003) (Sand). The concept is not, however, completely unbounded—since *McNally v. United States,* 483 U.S. 350, 358–359, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), it is "well-accepted that a scheme to defraud must include some false statement, representation or promise." *Id.* at 44–12. "The term 'false or fraudulent pretenses' means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth and that were made with the intent to defraud. They include actual, direct false statements as well as half-truths and the knowing concealment of facts." *First Circuit Pattern Jury Instructions: Criminal* § 4.12 (1998). *See also Beck v. Prupis,* 162 F.3d 1090, 1096 (11th Cir.1998) ("[M]aterial omissions can be the basis for a claim of fraud if they are intended to create a fraudulent representation.").

■ In some circumstances a failure to disclose material information may constitute fraud.

Putting aside the scienter element in fraud and looking only at behavior, the *locus classicus* of fraud is a seller's affirmative false statement or a half truth,

*i.e.,* a statement that is literally true but is made misleading by a significant omission. *See Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1348 (7th Cir. 1995) (Posner, C.J.). At common law, fraud doctrine did not impose any broader, general duty to disclose, *see Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), but it is settled that the mail and wire fraud statutes go somewhat beyond the common law, *see McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.1990). Thus, a leading commentary on federal jury instructions says that even where there is no falsehood or half truth:

> [T]he failure to disclose information may also constitute a fraudulent representation [under the mail and wire fraud statutes] if the defendant was under a legal, professional or contractual duty to make such a disclosure....

*Bonilla v. Volvo Car Corp.,* 150 F.3d 62, 69–70 (1st Cir.1998), *quoting* 2 Sand ¶ 44.01, at 44–11 (1997 ed.). *See also United States. v. Cassiere,* 4 F.3d 1006, 1022–1023 (1st Cir.1993) (approving an instruction that "[a] failure to disclose a material fact may also constitute a false or fraudulent representation if ... the person was under a general professional or a specific contractual duty to make such a disclosure ...."). There is, however, no element of reliance, reasonable or not, contained in the mail and wire fraud statutes. *Systems Management, Inc. v. Loiselle,* 303 F.3d 100, 104 (1st Cir.2002).

Defendants seize on the duty issue arguing that their Lupron® marketing efforts were directed to medical providers and not to the plaintiffs to whom they owed no fiduciary or contractual duty of disclosure. As defendants characterize the pleadings, "[a]t bottom, [p]laintiffs' complaint is that [d]efendants did not disclose to them the price at which third parties purchased Lupron." Defendants' Memorandum, at 15. Defendants cite *Bonilla, supra,* as a case squarely on point. Plaintiffs in *Bonilla* brought a RICO complaint objecting to Volvo's practice of adding accessories and emblems to vehicles after they had been shipped to market and then selling them as upgraded models, and (perhaps more to the point), charging different prices for the same car in different markets. As to the first allegation, the First Circuit concluded that Volvo owed no duty to disclose to customers where the add-on emblems and accessories had been installed. While acknowledging the existence of a "shadowy area ... in which conduct alone, in context, can amount to a misrepresentation," *Bonilla,* 150 F.3d at 70, the Court was clearly of the view that no fraud at all had occurred. "[T]he plaintiffs received the cars they ordered—Swedish-made Volvo 240 series car platforms with specified accessories—and this is so whether the Swedish volt meter and upgraded tires were installed in Sweden or Puerto Rico." *Id.* at 69. As the Court remarked, a rule that would require the disclosure of every conceivable piece of negative information about a product might well bring business to a standstill. "It would be a truly revolutionary change to make a criminal out of every salesman (assuming use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find— harbored in his heart the hope that the buyer would never ask." *Id.* at 70. *See also O'Ferral v. Trebol Motors Corp.,* 45 F.3d 561, 563 (1st Cir.1995) (per curiam) ("[M]ere nondisclosure, absent some affirmative misrepresentation or a special duty of disclosure, does not comprise RICO fraud."). *Cf. Ayres v. General Motors Corp.,* 234 F.3d 514, 521 (11th Cir.2000). As to the second complaint, that Volvo was

selling the identical car at a lower price in New York, the Court noted that while "[a]n excessive price can be the *result* of fraud ... there is nothing in the law of fraud that prevents even a single seller from charging different markups in different markets *so long as there is no affirmative misrepresentation.*" *Bonilla*, 150 F.3d at 71 (emphasis added).

Defendants see a perfect congruity between their conduct and that of the vindicated Volvo Car Corporation. "Plaintiffs cannot contend that [d]efendants owed them any professional, fiduciary, contractual, or other legal duty to disclose Lupron's pricing structure.... To the contrary, there is no duty to disclose pricing structures to consumers, and courts have dismissed RICO claims for that very reason." Defendants' Memorandum, at 17. As further support, defendants cite *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308 (11th Cir.2000). In *Langford*, the Eleventh Circuit affirmed the dismissal of a RICO complaint alleging that a drug store chain had implemented a scheme to defraud by charging uninsured customers higher prices for prescription medicines than it charged insured customers. While sympathetic to plaintiffs' argument that a duty to disclose might arise outside of a formal legal relationship, the *Langford* Court could find no federal (or Alabama) case imposing a duty on retailers to disclose pricing policies to consumers. Citing *Bonilla*, the Court held that "[d]ifferential pricing alone is not a fraudulent practice; plaintiffs must assert some particular reason why the relationship in this case was such that non-disclosure of the differential pricing structure constitutes a violation of the mail and wire fraud statutes." *Id.* at 1314. While expressing unease at Rite

Aid's practices, the Court was ultimately persuaded by the fact that retail prices in an open market economy are accessible to all consumers, and that "uninsured consumers are just as capable of seeking and using [that] information as are others." [17] *Id.*

A good argument can go wrong when its fundamental premise is flawed. It is true, as defendants contend, that no federal case or statute imposes a duty on a manufacturer to disclose to retail consumers the prices that it charges intermediate suppliers for its products, nor with a possible antitrust exception, is a seller required to charge the same price for a product to every consumer in every market. This is true even where the seller derives a presumed benefit from the consumer's ignorance of what it actually paid for the products it sells. *See Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F.Supp.2d 198, 212–214 (D.Mass.2002) (Saris, J.), *aff'd*, 316 F.3d 290 (1st Cir. 2003) (ERISA plan sponsor did not breach its fiduciary duty by failing to disclose to plan participants that a flat co-payment fee charged for prescription drugs at times exceeded the discounted cost of the drugs to the plan).

■ But this is not a case of nondisclosure. Defendants did not stand mute. As alleged in the Amended Complaint, defendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud. Whether one views the defendants' actions as involving the dissemination of information that was wholly false, or false because of an incomplete depiction of the truth, they are actionable under the mail and

---

**17.** The *Langford* Court, however, was careful to note that it could "envision many situations in which a failure to disclose information could constitute fraud pursuant to [the mail and wire fraud statutes], even where no duty to disclose exists independently." *Id.* at 1313.

wire fraud statutes.[18] Nor does it matter that defendants may not have specifically intended to deprive the plaintiffs of their money. In *United States v. Christopher*, 142 F.3d 46 (1st Cir.1998), the defendant was convicted of wire fraud after using the assets of acquired insurance companies to pay part of their purchase price and to clear liens in violation of promises that he had made to state insurance regulators. Part of the theory of the government's case was that his actions increased the risk and caused actual losses to company policyholders. This, the defendant argued, was at best a form of indirect victimization that was not prohibited by the wire fraud statute. According to the defendant, "the wire fraud statute requires 'convergence'—that is, the scheme must deceive the same person whom it deprives of money or property." *Id.* at 52–53. The argument was emphatically rejected by the First Circuit.

> Turning to whether we should now adopt a convergence theory, we see little reason to do so. Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived. The phrase "scheme or artifice ... for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341, is broad enough to include a wide variety of deceptions intended to deprive another of money or property. *McNally* itself says nothing about convergence. *See United States v. Evans*, 844 F.2d 36, 39 (2d Cir.1988). We see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud.

*Id.* at 54.

This is not a case of a retailer failing to disclose the discounted prices that it offered to favored customers (*Langford*), or a manufacturer the price differentials on its sales of the same product in different markets (*Bonilla*), or a health plan the discounts it received on prescription drugs (*Alves*). Rather, this is a case of affirmative misrepresentation. And because the alleged misrepresentations were knowing, deliberate, and made in furtherance of a scheme to defraud, they are sufficient to support the predicate acts of mail and wire fraud.[19]

---

**18.** In response to defendants' no duty to disclose argument, plaintiffs cite numerous cases holding corporations to a duty of full disclosure. *See, e.g., Roeder*, 814 F.2d at 26 ("When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate."); *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414–415 (1st Cir.1985) ("Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies."). Defendants' observation in their Reply Brief that the cited cases involve securities law violations in which a fiduciary relationship between a company and its shareholders is a given is correct. Nonetheless, the law of mail and wire fraud is firmly aligned with securities law on the issue of a defendant's liability for affirmative misrepresentations.

**19.** Defendants repeatedly assert that they had no duty to disclose what was publicly known to everyone, that is, that the Lupron® AWP was a "sticker price" and never intended to reflect the drug's true average wholesale price. In support of this argument, defendants cite a number of government reports acknowledging that the published AWPs for prescription drugs often exceed their acquisition cost. The argument is ultimately unpersuasive. There is a difference between a sticker price and a sucker price. If one were confronting a modest markup of the actual AWP for Lupron® (which 300% is not), intended to make sales of the drug for the treatment of Medicare patients commercially viable (given the 95% of AWP reimbursement rate), it is unlikely that there would have been a government investigation of TAP's marketing practices. Similarly, if the same inflated

### Lack of Particularity

██ The defendants' second argument alleges a failure on plaintiffs' part to plead fraud with particularity. More precisely, defendants complain that the plaintiffs have failed in the Amended Complaint to "set forth the time, place, content or individuals responsible for the supposed mail or wire fraud," and rely instead on generic assertions that marketing, sales, and other documents were disseminated by mail and wire. Defendant's Memorandum, at 20. *See Feinstein*, 942 F.2d at 42 ("It is settled law in this circuit that Fed.R.Civ.P. 9(b), which requires a party to plead fraud with particularity, extends to pleading predicate acts of mail and wire fraud under RICO."). In addition to *Feinstein*, defendants rely on *North Bridge Associates, Inc. v. Boldt*, 274 F.3d 38 (1st Cir. 2001).[20] In *North Bridge*, the RICO allegations arose from a dispute between investors in a time-share venture and a condominium trustee. The issue on appeal of the dismissal of the complaint by the district court was not a lack of specificity in the pleadings—the plaintiffs had identified two letters by date and content as constituting the predicate acts of mail fraud—but a lack of a showing of continuity. As the First Circuit concluded, "[t]he two 1997 letters are inadequate to establish a closed period of continuous criminal activity. Both the number of acts (two) and the span of time over which they extend (four months) were minimal." *North Bridge*, 274 F.3d at 43, citing *H.J., Inc. v. Northwestern Bell. Tel. Co.*, 492 U.S. 229, 242,

109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement."). Although plaintiffs had attempted to expand the time frame of the alleged fraud "by alleging that [the defendant] 'used the United States Mail' on at least two occasions in 1988 or later ..., they failed to identify the time, place or content of any particular mailing. Such vague allegations are insufficient [as *Feinstein* held]." *Id.* In *Feinstein*, which arose from a dispute over a failed real estate venture, the RICO claims were found defective because of noncompliance with Rule 9(b). The *Feinstein* plaintiffs alleged no more than that a five-year pattern of racketeering activity "consisted of various acts" in violation of the mail and wire fraud statutes. "Neither in this part of the complaint nor in count 1 proper did the plaintiffs supply any additional detail as to when the communications occurred, where they took place, or what they contained. Absent this rudimentary information, the complaint fell measurably short of meeting Rule 9(b)'s specificity requirement. It is not enough for a plaintiff to file a RICO claim, chant the statutory mantra, and leave the identification of predicate acts to the time of trial." *Feinstein*, 942 F.2d at 42.

In contrast, the Amended Complaint alleges a course of protracted conduct on the defendants' part that virtually spanned the ten years from the introduction of Lu-

---

AWP had not been used to set reimbursement rates for private purchasers and insurers, the Amended Complaint would not have been filed. The Blues, in their response to defendants' argument, have it exactly right: "[I]f everything [about Lupron®] was known to everybody, why did [d]efendants emphasize secrecy?" Blues Memorandum, at 7. Finally, the recognition on the part of government regulators of inefficiencies in the administra-

tion of Medicare does not, as defendants contend, amount to condonation of fraudulent conduct.

**20.** Defendants also cite *DeMauro v. DeMauro*, 2000 WL 231255 (1st Cir. Feb.16, 2000). However, as an unpublished opinion, *DeMauro* may not be cited under the First Circuit's Loc. R. 36 as authority in an unrelated case.

pron® to the American market to TAP's guilty plea in 2001. It is true, as defendants contend, that the Amended Complaint does not identify specific instances of mailings, or the use of facsimile transmissions, or the telephone.[21] But the Amended Complaint is reasonably specific as to the nature of the materials that are alleged to have been distributed in furtherance of the scheme. *See, e.g.,* Consolidated Complaint ¶ 88 (1996 fraudulent marketing materials), ¶ 108 (1995 fraudulent sales directives), ¶ 150 (national marketing and sales plans). More particularly ¶ 151 specifies eight categories of documents that are alleged to have been disseminated by mail or wire in furtherance of the scheme, including: (1) marketing materials promoting the AWP spread; (2) the submissions of the AWP to the *Red Book;* (3) communications related to the distribution of free samples; (4) inaccurate credit memos and invoices sent to physicians; (5) communications regarding junkets and the TAP into the Future program; (6) communications with government agencies misrepresenting the AWP; (7) similar misleading communications with patients and health insurers; and (8) the receipt of payments for Lupron®.

"Generally, there are three purposes behind Rule 9(b)'s particularity requirement: (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England Data Services, Inc. v. Becher,* 829 F.2d 286, 288 (1st Cir.1987). *See also McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228–229 (1st Cir.1980). In this regard, there is truth to the plaintiffs' assertion that the defendants' claim that they lack the required notice is somewhat incredulous given the criminal investigation, TAP's guilty plea, and the civil settlement with the government that preceded the Amended Complaint.[22] But whether or not the Amended Complaint is faithful in every respect to the requirements of Rule 9(b), a dismissal for failure to comply with the Rule at this point in the litigation would be inappropriate.

> [I]n a RICO mail and wire fraud case, in regards to the details of just when and where the mail or wires were used, we hold that dismissal should not be *automatic* once the lower court determines

---

**21.** This is not always the case. *See, e.g.,* ¶¶ 89–90 of the Consolidated Complaint which reference a 1995 interstate conference call in which TAP executives are said to have agreed to increase the spread between Lupron®'s AWP and its actual price to maintain a competitive advantage with doctors over a rival drug, Zoladex®.

**22.** Defendants' claim to have learned nothing from the criminal indictments and informations involving Lupron®. The suggestion that they were on notice as a result, according to defendants, "is based on a blatant mischaracterization of TAP's plea to a violation of the [Prescription Drug Marketing Act] which had nothing to do with Lupron's AWP, the primary focus of [p]laintiffs' claims in this ac-

tion." Defendants' Reply, at 8. This assertion is belied by any fairminded reading of the relevant documents, including the government's sentencing memorandum. These are replete with references to the manipulation of the Lupron® AWP and the other fraudulent acts that underlie the allegations of the Amended Complaint. I also note the representation by TAP's counsel at the sentencing hearing that the Chief Executive Officer of TAP (who was present in the courtroom) would communicate to his board the concerns expressed by the sentencing judge regarding the magnitude of the fraud, a board "which is in fact made up of individuals from both Abbott and Takeda." Dec. 6, 2001 Sentencing Tr., at 33.

that Rule 9(b) was not satisfied. In an appropriate case, where, for example the specific allegations of the plaintiff make it likely that the defendant used interstate mail or telecommunications facilities, and the specific information as to use is likely in the exclusive control of the defendant, the court should make a *second* determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint. We advocate this procedure because of the apparent difficulties in specifically pleading mail and wire fraud as predicate acts. In the instant case, it is seemingly impossible for the plaintiff to have known exactly when the various defendants phoned or wrote to each other or exactly what was said. The plaintiff clearly set out a general scheme, which very plausibly was meant to defraud the plaintiff, and also probably involved interstate commerce. Assuming the facts as stated in plaintiff's complaint, defendant Monarch Investments is incorporated in a different state than that resided in by the other defendants. In this day and age, it is difficult to perceive how the defendants would have communicated without the use of the mail or interstate wires. *See Federal Deposit Insurance Corp. v. Kerr*, 637 F.Supp. at 835 ("... it is hard to imagine how such a transaction could be carried out without the use of such interstate devices.").

*Becher*, 829 F.2d at 290–291. If, for example, I take the most telling of the acts of alleged fraud, TAP's publication in the *Red Book* of the inflated AWP during the years 1992 to 2000, it is possible that TAP was

prescient enough to rely solely on bicycle messengers (or verbal communications as defendants suggest) to communicate with the publishers, but I doubt it. The suggestion is improbable enough to permit plaintiffs an opportunity to rectify any deficiencies in the Amended Complaint in this regard upon the completion of discovery.[23]

### The Enterprise

As previously stated, plaintiffs posit three theories: (1) TAP as the enterprise, with Takeda and Abbott as the RICO persons; (2) TAP, Abbott, and Takeda as an associational enterprise in fact, with each of the constituent companies acting as a RICO person; and (3) TAP, Abbott, and Takeda as RICO persons, with the doctors who participated in reaping the rewards of the Lupron® marketing scheme serving as an associational enterprise.[24]

 As to the TAP enterprise, I do not understand defendants to object to the underlying legal theory, but rather to plaintiffs' alleged failure to plead facts showing how Abbott and Takeda participated in the conduct of the affairs of TAP. The argument merits only one sentence in defendants' opening brief, and is somewhat difficult to parse, but it appears to simply restate the argument that the alleged acts of mail and wire fraud are plead with insufficient particularity. As I have already rejected that argument, there is nothing left to be said. If defendants are suggesting that plaintiffs have failed to allege facts sufficient to meet the *Reves* standard (that a RICO defendant be shown to have taken "*some* part in directing the enterprise's affairs," *id.*, 507 U.S.

---

**23.** Unlike the case in *North Bridge,* where *Becher* was held not to apply, plaintiffs here (as in *Becher* ) have assiduously pursued discovery. *See Feinstein,* 942 F.2d at 43 & n. 10.

**24.** Plaintiffs also allege a section 1962(d) RICO conspiracy involving TAP, Takeda, and Abbott.

at 179, 113 S.Ct. 1163), the argument stands on even shakier ground.[25] The Amended Complaint alleges that high-ranking Takeda officials were installed in TAP's headquarters to oversee its activities, that Abbott and Takeda collectively determined the price that TAP would charge doctors for Lupron®, that Abbott and Takeda set the published AWP thereby determining the spread, and that Abbott and Takeda supervised and directed TAP's Lupron® marketing scheme, including the distribution of free samples. These allegations are sufficient to satisfy the *Reves* test.[26]

▮ With respect to the second theory, defendants begin with the accurate observation that a single entity cannot be both a RICO "enterprise" and a RICO "person." *Hasbro*, 103 F.3d at 190. Defendants rely principally on *Odishelidze* for the assertion that "[p]laintiffs cannot name the three [d]efendants as RICO 'persons' and then allege that the same three [d]efendants constitute the RICO 'enterprise.'" Defendants' Memorandum, at 22. In *Odishelidze*, a RICO count identifying a single company, its subsidiaries and employees as the RICO enterprise, was found deficient for failing to allege any entity distinct from the enterprise as a RICO

person. As the Court stated (quoting from an earlier decision, *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 29–30 (1st Cir.1986)), "[i]t is only a person, or one associated with an enterprise, not the enterprise itself, who can violate the provisions of [section 1962(c) ]." *Odishelidze*, 853 F.2d at 24. The reason why this is so was explained by Judge Fuste in *Rodriguez v. Banco Central*, 777 F.Supp. 1043 (D.P.R.1991), *aff'd*, 990 F.2d 7 (1st Cir.1993).

> Under 1962(c), the enterprise and the "person" who violates the statute must be distinct from each other, the former being exempt from liability, the latter being the targeted defendant. *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir.1986). The distinction requirement is not satisfied by merely naming a corporation and its employees, affiliates, and agents as an association-in-fact, since a corporation acts through its employees, subsidiaries and agents, and would thereby be merely associating with itself. *Odishelidze v. Aetna Life & Casualty Co.*, 853 F.2d 21 (1st Cir.1988); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987). Where the plaintiffs have suffered harm at the hands of an enterprise that consists only of a

---

**25.** Abbott's Brief, at 9, would elevate the *Reves'* participation test to one of "control" of the enterprise, a significantly higher standard than *Reves* contemplates. "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.*, 507 U.S. at 179 & n. 4, 113 S.Ct. 1163 (rejecting "the suggestion of the Court of Appeals of the District of Columbia that § 1962(c) requires *'significant control* over or within an enterprise.' ").

**26.** The Blues plaintiffs, relying on *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir.

1994), and *United States v. Owens*, 167 F.3d 739, 754 (1st Cir.1999), argue that because Abbott and Takeda are alleged to have been enterprise "insiders," no allegation that they participated in the operation or management of the enterprise is required. (*Oreto* and *Owens* seem literally to hold that the *Reves'* participation requirement is applicable only to enterprise outsiders). The defendants argue that the Blues plaintiffs broad reading of *Oreto* and *Owens* is precluded by *United States v. Marino*, 277 F.3d 11, 34 (1st Cir.2002), which appears to hold that the *Oreto* analysis applies only to lower rung participants in an enterprise who are shown to have been integral to the carrying out of its affairs. As I find that the *Reves* test has been satisfied, the dispute need not be resolved.

single corporation and its employees, subsidiaries or agents, the plaintiffs "must choose between the corporation and its constituents as persons liable." If the plaintiff chooses to identify the corporation as the enterprise through which its employees, as persons, conducted the RICO activity, the corporation is insulated from liability. It is for this reason that plaintiffs often try to prove the more intricate association-in-fact, in order to save as defendants all the corporate entities in the scheme, often the deep pockets.

*Id.*, 777 F.Supp. at 1054 (some internal citations omitted). It is the latter route indicated by Judge Fuste that plaintiffs have chosen to travel by defining the enterprise as a combination of the three separate companies in an informal association-in-fact, while at the same time defining each defendant in a separate capacity as a RICO person. As a pleading theory, the idea that a defendant may be both a person and a member of a collective RICO enterprise has substantial support in the reported cases. *See, e.g., United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir.2000) ("The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise."); *Cullen v. Margiotta*, 811 F.2d 698, 729–730 (2d Cir.1987) ("[T]here is neither a conceptual or doctrinal difficulty in positing an entity associated with a group of which it is but a part."). The basic idea is that while one basketball player does not constitute a team, an association of five players does,

without each losing his identity as a distinct person. In *Odishelidze* (and *Schofield*), only one entity was said to have filled the dual function of person and enterprise. That is not the case where, as here, the enterprise is said to be the collective whole of its constituent parts.

 Plaintiffs' third theory is more problematic. Plaintiffs allege a "Physicians Enterprise," an association-in-fact consisting of TAP and all doctors (and other providers of medical services) who dispensed Lupron® to patients (with the three corporate defendants as the RICO persons).[27] An association-in-fact is defined not by a formal legal structure or similar attributes, but by the association of its members "for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. A durational component is also required, that is, the association must "function as a continuing unit," as RICO is concerned with repetitive, and not episodic conduct. *Id.* "Common purpose" does not mean commonality of motive, it means coordinated activity in pursuit of a common objective. *See Welch*, 53 F.3d at 443 ("[S]imilarity of goals and methods does not suffice to show that an enterprise exists; what is necessary is evidence of systematic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination."). Here, as defendants point out, there are no allegations (and it is difficult to see how there could be) that the thousands of doctors who benefitted from discounted purchases or free samples of Lupron® were associated together in any meaningful sense, or were even aware of

---

**27.** The Class Action Complaint sets out (in Count IV) an "Individual Physician Enterprise" theory. Under this theory, TAP and every individual physician or practice group who participated in the Lupron® marketing scheme would constitute a separate association-in-fact enterprise. Plaintiffs admit that they have no idea of how many separate ac-

tions this theory would entail, but admit that it could be as many as 15,000. Class Action Complaint ¶ 201. Perhaps in response to the court's criticism of this theory as "totally unmanageable," the Blues' plaintiffs have omitted this theory from the Consolidated Complaint.

one another's existence as participants in a scheme to defraud. *See Feinstein*, 942 F.2d at 41 n. 7; *Blue Cross of California v. SmithKline Beecham Clinical Labs., Inc.*, 62 F.Supp.2d 544, 553 (D.Conn.1998). Without the elements of organization and control, whether informal or formal, and the existence of an association, whether legal or factual, any group of persons sharing a common occupation, *e.g.*, urologists and lawyers, and a similar motive, *e.g.*, greed, could be held to constitute a RICO enterprise.[28] This essentially is all that plaintiffs have alleged. *See, e.g.*, Consolidated Complaint ¶ 191 ("The Physician Enterprise ... consists of a group of 'persons' associated together for the common purpose of selling and providing Lupron® to [p]laintiffs and earning profits therefrom.").[29]

### Causation

RICO requires "some direct relation between the injury asserted and

---

**28.** I do not find the cases which plaintiffs cite in support of the theory to be helpful to their cause. The court in *In re Managed Care Lit.*, 185 F.Supp.2d 1310, 1323–1324 (S.D.Fla. 2002), specifically found that the alleged enterprise, consisting of an insurer, various health plans, and the doctors, medical laboratories, pharmacies and other health providers who had contracted with the insurer, functioned as a cohesive network and thus satisfied *Turkette's* associational requirements. Similarly, in *Corporacion Insular de Seguros v. Reyes Munoz*, 826 F.Supp. 599, 605 (D.P.R. 1993), the court made a specific finding that the alleged enterprise was an ongoing organization with an established mechanism for decision-making and direction.

**29.** The Amended Complaint is not improved by the borrowing of the concept of conspiracy from a criminal information filed against one urologist who plead guilty to conspiring with TAP. Consolidated Complaint, ¶ 110. While a conspiracy in appropriate circumstances can constitute an association-in-fact, *but see Bachman v. Bear Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir.1999), it is so only insofar as the parties to the agreement are concerned. Here, there is no allegation of a general agreement between TAP and the collective providers, rather individual agreements between TAP and the respective providers are alleged. This type of "hub-and-spoke" configuration of a conspiracy is largely disfavored. *See Kotteakos v. United States*, 328 U.S. 750, 769, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (requiring proof of each separate conspiracy). The issue was addressed by Judge Saris in *In re Pharmaceutical Industry Average Wholesale Price Lit.*, 263 F.Supp.2d 172, 183 (D.Mass. 2003), and I will not attempt to improve upon her analysis or marshaling of the cases.

Most courts have found that complaints alleging hub-and-spoke enterprises fail to satisfy the RICO enterprise requirement. *See VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 700 (6th Cir.2000) (rejecting a RICO enterprise involving defendant bank and a series of sub-lenders with whom the bank associated, because there were no allegations of a mechanism by which this group "conducted its affairs or made decisions"); *New York Auto. Ins. Plan v. All Purpose Agency & Brokerage, Inc.*, 97–CV–3164, RICO Bus. Disp. Guide 9611, 1998 WL 695869 at *6 (S.D.N.Y.Oct.6, 1998) (rejecting a hub-and-spoke enterprise in which auto-insurer conspired with individual clients to provide them lower insurance rates, without any evident association between the clients; stating "Such a series of discontinuous independent frauds is not an 'enterprise.' Each is a single two-party conspiracy."); *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F.Supp. 89, 98 (S.D.N.Y.1993) (holding that hub-and-spoke scheme is not an enterprise); *Blue Cross and Blue Shield of Ala. v. Caremark, Inc.*, 98–CV–1285, RICO Bus. Disp. Guide 9828, 1999 WL 966434 at *8 (N.D.Ill.1999) (rejecting enterprise theory in RICO insurance-fraud claim involving health providers because "[p]laintiffs fail to allege how this large and geographically diverse group of almost 3,000 independent physicians and entities acted in concert with one another .... there is no indication that the individual [providers] were even aware of each other's existence."); *Blue Cross of Cal. v. SmithKline Beecham Clinical Labs., Inc.*, 62 F.Supp.2d 544, 551–53 (D.Conn.1998) (rejecting proposed enterprise consisting of insurer and, among others, thousands of doctors, where there was no evidence doctors

the injurious conduct alleged." *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311. Defendants challenge to this element of plaintiffs' RICO claims borders on the frivolous. The argument begins with a settled principle of law, that the intervening act of a third party can break the chain of proximate causation thereby relieving the original actor of liability. *Griffiths v. Campbell,* 425 Mass. 31, 34–36, 679 N.E.2d 536 (1997). The intervening third party actors to whom defendants refer are the physicians who purchased and prescribed Lupron®, the publishers of the *Red Book* and other industry journals who listed the AWP, and the government itself, which through Medicare, set the reimbursement rate for Lupron®. What the argument ignores is the corollary requirement that the intervening act be unforeseeable and completely independent of any act undertaken by the original actor. (An arsonist, for example, is not relieved of liability by a fireman's intervening efforts to suppress the fire). *See Massachusetts Superior Court Civil Jury Instructions* § 2.1.9 (1998). A proximate cause need not be a precipitating or "but for" cause, in the sense of being the last cause in a chain of events leading to the harm, but need only be a substantial cause of a succession of events that in a logical sequence ultimately causes a plaintiff injury. *Id.* § 2.1.8. Here it was defendants who instigated both the culpable and the innocent intermediaries to commit acts that were not only foreseeable but intended. By way of analogy, a company that issues its stock at a fraudulently inflated price is not insulated from liability by the intervening acts of the brokers, transfer agents, and financial analysts who promote the sales of its stock, execute trades on behalf of injured investors, and report the company's falsified financial statements. Plaintiffs' allegations that as a result of the Lupron® marketing

were even aware of alleged kickback

scheme they were induced to make many millions of dollars in overpayments for the drug is more than sufficient to satisfy RICO's causation requirement at the pleading stage. *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

### Detrimental Reliance

██ The essence of defendants' argument on this element is the absence of any evidence (or substantive allegation) that plaintiffs relied on misrepresentations by the defendants (in the sense that there is no assertion that any plaintiff consulted the published AWP for Lupron® in deciding on a course of treatment or that the benefit plans were unaware that the Lupron® AWP as published was pegged higher than its actual cost). While the argument that the common-law requirement of detrimental (justifiable) reliance is an element of a civil RICO case premised on fraud had found significant support in a number of courts at the time defendants' briefs were filed, it was rejected by the First Circuit in *Loiselle.*

> Perhaps there is some surface incongruity in allowing a civil RICO plaintiff to recover for fraudulent acts even though the same plaintiff could not (for lack of reliance) recover for fraud at common law. But Congress structured its civil remedy to allow recovery for harm caused by defined criminal acts, including violation of section 1341; and, as noted, the federal mail fraud statute does not require reliance. Thus, under a literal reading of RICO—the presumptive choice in interpretation—nothing more than the criminal violation and resulting harm is required.

*Id.,* 303 F.3d at 104. *See also Neder,* 527 U.S. at 24–25, 119 S.Ct. 1827 ("The common-law requirements of 'justifiable reliance' and 'damages' … plainly have no

scheme).

place in the federal [mail and wire] fraud statutes.").

*Conspiracy*

■■■■ To establish a RICO conspiracy under section 1962(d), plaintiffs must show: "(1) the existence of enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses." *Aetna Casualty*, 43 F.3d at 1561. Count IV of the Amended Complaint is, as defendants assert, lightly plead, but each of the essential elements of the cause of action are set out, and when considered in the light of the allegations of the Amended Complaint as a whole are sufficient to survive a motion to dismiss. It is true, as defendants say, that the plaintiffs provide no intimate details on how or when the conspiratorial agreement was formed, but it would be the exceptional case in which such details were known to a stranger to the illicit pact. Moreover, a conspiratorial agreement need not be the fruit of express, formal negotiations "as long as its existence may be inferred from the 'defendants' words and actions and the interdependence of activities and persons involved.'" *United States v. Martin*, 228 F.3d 1, 11 (1st Cir.2000), *quoting Cassiere*, 4 F.3d at 1015. *Cf. United States v. Boylan*, 898 F.2d 230, 242 (1st Cir.1990) ("[A] RICO conspiracy does not demand total fusion or that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants."). Again, Count IV might have been better plead, but it is sufficiently plead. *See* 5 Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1251.1 ("For the most part, [RICO] conspiracy claims have not been held to the Rule 9(b) standard . . . .").

*State Consumer Protection Act Claims Preemption*

■■■■ Defendants' principal challenge to plaintiffs' consumer protection act claims is predicated on the argument that they are preempted by the Medicare Act, and in the case of plaintiff Twin Cities, by the federal Employee Retirement Security Act (ERISA), 29 U.S.C. § 1144(a). Defendants' preemption argument has two facets, both based on the doctrine of implied preemption.[30] Defendants first argue field preemption. "Congress's intent to occupy a given field can be inferred from the pervasiveness of federal regulation and/or the dominance of the federal interest in a particular area of legislative activity." *Massachusetts Assoc. of Health Maint. Org. v. Ruthardt*, 194 F.3d 176, 179 (1st Cir.1999). The Medicare system, defendants contend, with its "pervasive, extensive, and detailed statutes and regulations establishing the reimbursement provided to Medicare providers and the amount paid for benefits by Medicare recipients as a co-payment or deductible," is a prime example of such implied intent. Defendants' Memorandum, at 34. Defendants also argue that federal preemption can be inferred from the conflict between state law and federal law that would result should plaintiffs prevail on their state law claims. "[S]tate law is impliedly preempted to the extent it 'actually conflicts' with federal law. Actual conflict occurs where compliance with both state and federal law is a 'physical impossibility,' or where state

---

**30.** Defendants concede that no Medicare statute or regulation expressly preempts plaintiffs' state law causes of action.

law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 68 (1st Cir.1997) (internal citations omitted). As defendants frame the conflict issue, "[p]laintiffs seek a judicial determination that under state laws, pharmaceutical companies cannot cause AWP to be higher than the price they charge to providers for covered drugs.... Congress has intentionally maintained a system in which AWP provides the basis for Medicare payment, despite the fact that it is higher than the price charged to providers. Thus, [p]laintiffs seek rulings under state laws that would directly conflict with long-established federal law." *Id.* at 35.

▮▮▮▮ "Congress's intent is the touchstone of preemption analysis.... State common law claims may be preempted along with state statutes and regulations, if Congress so intended." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 16 (1st Cir. 1994) (FDA standards preempted a state common-law negligent failure-to-warn claim). Where, however, federal law touches upon matters historically committed to the police powers of the state, preemption will be found only if "that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). *See also Barnett Bank v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). The regulation of medicine and its associated costs "seems by tradition to be one of state concern." *Massachusetts Medical Society v. Dukakis*, 815 F.2d 790, 791 (1st Cir.1987) (Breyer, C.J.) (the Medicare Act did not preempt a state statute forbidding doctors from billing for the balance between their actual fee and the reimbursable amount deemed a "reasonable charge" by regulators). *See also Medical Society of the State of New York v. Cuomo*, 976 F.2d 812, 816 (2d Cir.1992) ("The regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state."). I find no evidence in the Medicare Act or the attendant regulations authorized by Congress of an implied intent to usurp the historical authority of the states to regulate medical costs. That Congress has expressly invoked preemption over some aspects of Medicare, while ignoring others, is powerful evidence to the contrary.[31] *See Ruthardt*, 194 F.3d at 185 (finding a "clear and manifest" intent by Congress to preempt state laws regulating benefit standards under the Medicare + Choice program). Finally, I am not impressed with the argument that the failure of Congress to act more forcefully in making changes to what in some respects appears to be a flawed AWP reimbursement mechanism evidences any preemptive intent on its part.[32] Again, I do not propose to improve

---

**31.** Preemption law cautions against a finding that a Congressional act preempts a state law through silence. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

 The negative presumption is even stronger when the state law at issue creates a remedy unavailable under federal law. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *United Construction Workers v. Laburnum Construction Corp.*, 347 U.S. 656, 663–64, 74 S.Ct. 833, 98 L.Ed. 1025 (1954); *Rice. v. Santa Fe Elevator Corp.*, 331 U.S. at 230, 67

S.Ct. 1146. And, it is virtually conclusive when Congress, in the very statute at issue, *explicitly* pre-empts other state law remedies but not the remedy at issue. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, [517–18], 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

*Schafer v. American Cyanamid Co.*, 20 F.3d 1, 6–7 (1st Cir.1994).

**32.** Defendants' reliance on the Congressional mandate imposed by the Medicare, Medicaid, and SCHIP Benefits Improvement Protection Act of 2000 (BIPA), Pub.L. No. 106–554,

on Judge Saris's conclusion in addressing the same issue in *Pharmaceutical Average Wholesale Price Lit.*, 263 F.Supp.2d at 187–188.

> Here, the fact that Congress has failed to disturb the widespread practice on the part of pharmaceutical companies of grossly overstating their AWPs cannot be read as a clear and manifest intention to grant immunity from state regulation of such fraudulent practices. Because there is no evidence of a clear and manifest intent to preempt the entire field of state regulation of fraudulent medical billing practices, claims based on state consumer protection statutes that allege such practices are not preempted. *Cf. Hofler v. Aetna U.S. Healthcare of California, Inc.*, 296 F.3d 764, 768 (9th Cir. 2002) ("Because Congress did not clearly manifest any intention to convert all state tort claims arising from the administration of Medicare benefits into federal questions, we hold that the Medicare program does not completely preempt state tort law claims.").

Defendants' conflict preemption argument fares no better. Defendants essentially misstate the issue. Plaintiffs are not seeking, as defendants claim, a judicial declaration invalidating the use of the Lupron® and other AWPs by Medicare regulators as a benchmark for setting reimbursement rates for prescription drugs. What plaintiffs are instead seeking is to punish defendants for fraudulently manipulating the spread between the AWP and the actual cost of the drug and for encouraging doctors to falsely bill for free samples as part of a scheme to promote brand loyalty, ultimately at plaintiffs' expense. While it is true that a state court will be called upon to draw a line between a reasonable profit and fraudulent conduct in assessing plaintiffs' damages, this line-drawing exercise has nothing to do with the wisdom of the system Congress has put in place to govern Medicare reimbursements, nor should it. Nor is the exercise itself an exotic adventure. It is the stuff of what courts (and juries) do every day by the very nature of their function. Defendants' concern that "[i]f [p]laintiffs' state law claims are permitted to go forward, Medicare providers would be forced to contend with the 50 states' varying laws, as well as Medicare rules, whenever they interact with the federal government regarding the Medicare program," is a valid one. Defendants' Memorandum, at 36. However, a degree of unevenness in result is a familiar aspect of a federal constitutional system that respects the sovereign decision-making of its constituent parts. But one would think that a drug company interacting honestly with the federal Medicare regime would have little to fear from the states, whose interest in a sound Medicare program is presumably no less fervent than is that of the federal government, or if abuse did result, that the Supreme Court would hesitate to invoke its constitutional power "to review a state court's decision of a federal issue in a state cause of action." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S.

---

§ 429(a), 114 Stat. 2763 (2000), temporarily forbidding HHS from directly or indirectly decreasing the AWP reimbursement rate as indicating Congress's satisfaction with the present system is somewhat puzzling. BIPA froze the reimbursement rate at 95% of AWP. It did not freeze the published AWPs. Thus, it is not true, as defendants claim, that to conclude "that [d]efendants overstated or manipulated the AWP for Lupron …, this [c]ourt would have to rule that state law somehow trumps the [BIPA] directing that no changes be made to Medicare's reimbursement system." Defendants' Reply, at 27. The court would only have to conclude that defendants deliberately misstated the AWP and caused plaintiffs injury as a result. That conclusion implies no conflict whatsoever with the structure of the Medicare reimbursement system.

804, 816, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). In sum, I can conceive of no overriding federal interest in immunizing fraudulent conduct simply because a federal, rather than a state statute or regulation, opens the door of opportunity for fraud.[33]

 Section 514(a) of ERISA, 29 U.S.C. § 1144(a), preempts any and all state claims "related to" an employee benefit plan (except state laws that "regulate insurance." 29 U.S.C. § 1144(b)(2)(A)). A law "relates to" an ERISA-covered plan if it has a connection with or makes reference to such a plan. *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). *Cf. Harris v. Harvard Pilgrim Health Care, Inc.,* 208 F.3d 274, 281 (1st Cir.2000) ("ERISA will be found to preempt state-law claims if the trier of fact necessarily would be required to consult the ERISA plan to resolve the plaintiff's claims."). On the other hand, state laws that have merely a "tenuous, remote, or peripheral connection with a covered benefit plan," as is the usual case with laws of general applicability, are not preempted. *Boston Children's Heart Foundation, Inc. v. Nadal-Ginard,* 73 F.3d 429, 439 (1st Cir.1996).

*See also New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 660–662, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (ERISA does not preempt state regulation that has only "an indirect economic effect" on purchasers of ERISA plans); *Morstein v. National Ins. Serv., Inc.,* 93 F.3d 715, 721 (11th Cir.1996) (en banc) (holding that because *Travelers* had "turned the tide on the expansion of preemption doctrine," a fraud claim against an individual insurance agent who misrepresented the scope of an ERISA plan's coverage was not preempted). *See also Carpenters Local Union No. 26 v. United States Fidelity & Guaranty Co.,* 215 F.3d 136, 139–140 (1st Cir.2000) ("[U]nless congressional intent to preempt clearly appears, ERISA will not be deemed to supplant state law in areas traditionally regulated by the states.").

 Defendants argue that because the claims of ERISA plaintiff Twin Cities concern the payment of benefits, a "core ERISA concern" is implicated. "The [c]ourt would necessarily be required to consult the terms of Twin Cities' plan to determine whether and to what extent it allegedly overpaid for Lupron." Defendants' Memorandum, at 37.[34] Case law, however, uniformly holds that ERISA pre-

**33.** I agree with plaintiffs that the preemption concerns reflected in *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), are largely irrelevant to this case. In *Buckman,* plaintiffs were attempting to establish derivative standing based on a "fraud-on-the-agency" theory, that is, allegedly false representations made by the erstwhile defendants to the Food and Drug Administration to secure approval of a new medical device. As the Supreme Court observed, "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied," and that preemption was appropriate because "the relationship between a federal agency and the entity that it regulates is inherently federal in character...." *Id.* at 347, 121 S.Ct. 1012. Defendants are not regulated entities in the *Buckman* sense. As plaintiffs

point out, the defendants "did not submit pricing data to [Medicare] so that [Medicare] could determine or approve the AWP." Plaintiffs' Memorandum, at 47. To the contrary, they published the fraudulently inflated AWPs for Lupron® precisely because they knew that the AWPs were not subject to regulatory scrutiny. For the same reasons, defendants' suggestion that they cannot be held liable under the New York, Virginia, and Connecticut consumer protection laws, among others, because those laws provide exceptions for acts undertaken in compliance with federal laws and regulations is thoroughly unconvincing.

**34.** Defendants also argue that a variance in the method of calculating benefits from state to state would undermine the ERISA objective of establishing nationally uniform plan

emption does not bar a plan from bringing a suit against a third party to protect the assets of the plan or the interests of its beneficiaries. *See, e.g., LeBlanc v. Cahill,* 153 F.3d 134, 138 (4th Cir.1998) (ERISA does not preempt "a state common law cause of action for fraud, pressed by a pension plan subject to ERISA, against a third party who is neither a fiduciary nor a party in interest with respect to the plan …".). "[I]f there is no effect on the relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—there is no preemption." *Airparts Co., Inc. v. Custom Benefit Servs. of Austin, Inc.,* 28 F.3d 1062, 1065 (10th Cir.1994) (authorizing the prosecution of common-law fraud claims against a plan consultant). *Cf. Carpenters Local,* 215 F.3d at 141 ("ERISA preemption proscribes the type of alternative enforcement mechanism that purposes to provide a remedy for the violation of a right expressly guaranteed and exclusively enforced by the ERISA statute. Those state laws which touch upon enforcement but have no real bearing on the intricate web of relationships among the principal players in the ERISA scenario (e.g., the plan, the administrators, the fiduciaries, the beneficiaries, and the employer) are not subject to preemption on this basis.").

As plaintiffs point out, "[h]ere, neither the plan administrator, fiduciary, or beneficiary of the plan, nor the employer, is disputing the terms of the benefit plan or the scope of its benefits." Plaintiffs' Memorandum, at 50. Nor are defendants "principal players in the ERISA scenario." *Carpenters Local,* 215 F.3d at 141. Twin Cities is seeking under a state law of general applicability to recover on behalf of the beneficiaries of the plan money that it believes was leached from the plan by third party fraud. Why a court would, as the defendants contend, be required to consult the plan documents to determine whether it had overpaid for Lupron® is totally unexplained. (The relevant documents that establish the scope of the alleged fraud are for the most part those that were generated by the defendants in executing the scheme). Because none of the badges of ERISA preemption are remotely implicated, no ERISA preemption is at play.

*Pleading Sufficiency*

Counts V through XV and Counts XVIII and XIX of the Consolidated Complaint assert consumer protection act claims under the law of each of the Blues plaintiffs' state of incorporation.[35] The statutes are essentially similar in that they authorize a

---

administration. *Id.* I frankly do not follow the argument. Benefits already vary from plan to plan and ERISA does not require otherwise.

**35.** The Blues plaintiffs and statutes by Count in the Consolidated Complaint are: (Count V) Empire Blue Cross and Blue Shield—New York Gen. Bus. Law, § 349 ("[d]eceptive act or practices in the conduct of any business"); (Count VI) Blue Cross and Blue Shield of Florida—Fla. Stat. Ann. § 501.204 ("[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices or practices in the conduct of any trade or commerce are hereby declared unlawful"); (Count VII) Trigon—Va.Code Ann. § 59.1-200 ("fraudulent acts or practices committed by a supplier in connection with a

consumer transaction"); (Count VIII) Blue Cross and Blue Shield of Kansas City—Mo. Ann. Stat. § 407.020 ("deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise"); (Count IX) Wellmark—S.D. Codified Laws § 37-24-6 ("deceptive act or practice, fraud, false pretense, false promise, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement or any merchandise, regardless of whether any person has been mislead"); (Count X) Blue Cross and Blue Shield of Montana—Mont. Code Ann. § 30-14-103 ("unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."); (Count XI) Blue Shield of Cali-

cause of action against a commercial defendant who is accused of deceptive acts or fraudulent practices. Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204, for example, states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices or practices in the conduct of any trade or commerce are hereby declared unlawful," while Missouri's Merchandising Practices Act, Mo. Ann. Stat. § 407.020, prohibits "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mail and wire fraud, the predicate acts underlying plaintiffs' RICO claims, are by definition unfair and deceptive acts. If plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any of the referenced statutes

will follow almost as a matter of course.[36] Consequently, the motion to dismiss these counts will be denied.[37]

### Common–Law Fraud

▬▬▬ Defendants argue that plaintiffs' common-law fraud claim, which is based on local law in the state in which each plaintiff resides, is insufficiently plead. Relying on the parties' briefs, I will assume that there is a commonality among these states in defining the elements of a common-law misrepresentation claim and that Massachusetts would serve as an exemplar in requiring a showing of: (1) the making of a false statement of fact; (2) known by the defendant to be false when made (or believed by the defendant to be so); (3) with the intent that the victim rely on its truth; and (4) upon which the victim did rely in parting with his property. *Commonwealth v. Leonard,* 352 Mass. 636, 644–645, 227 N.E.2d 721 (1967). Common-law fraud is no more ex-

fornia—Cal. Bus. & Prof.Code §§ 17203 and 17200 ("any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising"); (Count XII) Highmark—73 Pa. Cons.Stat. §§ 201–3, 201–2(4)(xxi) ("[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce"); (Count XIII) Blue Cross and Blue Shield of Nebraska—Neb. Rev. Stat. § 59–1602 ("[u]nfair methods of competition and unfair or deceptive acts or practices"); (Count XIV) Blue Cross and Blue Shield of Louisiana—La. Rev. Stat. Ann. § 51:1405 ("[u]nfair methods of competition and unfair or deceptive acts or practices"); (Count XV) Blue Cross and Blue Shield of Tennessee—Tenn. Code Ann. § 47–18–104 ("[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce"); (Count XVIII) Oxford—Conn. Gen.Stat. Ann. § 42–110b(a) ("unfair methods of competition and unfair or deceptive acts or practices"); and (Count XIX) Horizon—N.J. Stat. Ann. § 56:8–2 ("any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or

omission, in connection with the sale or advertisement of any merchandise"). The Class Action Complaint asserts claims under the consumer protection laws of all fifty states and the District of Columbia.

**36.** Defendants make the same argument with respect to these claims as they do with respect to the RICO claims, that they are plead with insufficient particularity to satisfy Rule 9(b). As each claim incorporates the RICO mail and wire fraud allegations of the Amended Complaint, and as I have found those allegations sufficiently plead to satisfy Rule 9(b) insofar as RICO is concerned, it follows that I find that the consumer protection act claims satisfy Rule 9(b) as well.

**37.** In contrast to plaintiffs' common-law fraud claims, none of the specified state consumer protection acts (as best I can determine) requires proof of actual reliance on the deceptive act. They require proof only of a causal connection between the deceptive act and a plaintiff's loss. *See, e.g., International Fidelity Ins. Co. v. Wilson,* 387 Mass. 841, 850, 443 N.E.2d 1308 (1983).

empt than is statutory fraud from Rule 9(b)'s requirement that "the circumstances constituting fraud or mistake shall be stated with particularity." Count XVI (the common-law fraud Count), generically incorporates all of the preceding paragraphs of the Amended Complaint, and in that respect, sufficiently identifies the alleged false statements of fact. The Count, however, does not allege that the defendants intended that the individual plaintiffs be deceived by these statements, or that any plaintiff actually relied on the defendants' misrepresentations. (It is not enough to simply aver that plaintiffs "reasonably relied upon the veracity of [d]efendants regarding the AWP."). Consequently, this Count will be dismissed. *See Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387, 401 (2d Cir.2001).

### Unjust Enrichment

 Unjust enrichment is regarded by most (but not all) states as an equitable claim. Under the doctrine of unjust enrichment a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable.[38] To satisfy the five elements of unjust enrichment, a plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *LaSalle Nat'l Bank v. Perelman*, 82 F.Supp.2d 279, 294–295 (D.Del.2000) (citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del.Ch.1999)). The

doctrine does not require any contractual or fiduciary relationship between the parties as a prerequisite of suit. *Greenwald v. Chase Manhattan Mortg. Corp.*, 241 F.3d 76, 78 n. 1 (1st Cir.2001). Where a contract does govern the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies. *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir.2003). This principle is simply an extension of the fifth element of the doctrine, that where a plaintiff has an adequate remedy at law, a claim of unjust enrichment is unavailable. *See id.*, at 1093 (Delaware law); *Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F.Supp. 340, 347 (D.Mass.1982) (Nelson, J.) (federal common-law); *Massachusetts v. Pace*, 616 F.Supp. 815, 822 (D.Mass.1985) (Garrity, J.) (same); *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F.Supp. 683, 687 (D.Mass.1991) (Tauro, J.) (same); *One Wheeler Road Assocs. v. Foxboro Co.*, 843 F.Supp. 792, 799 (D.Mass.1994) (Young, J.) (same); *Popponesset Beach Ass'n., Inc. v. Marchillo*, 39 Mass.App.Ct. 586, 593, 658 N.E.2d 983 (1996) (Massachusetts law). Again, as with the claim of common-law fraud, the unjust enrichment claim is plead generically in Count XVII without any reference to the laws of those states in which plaintiffs maintain that unjust enrichment is a legal rather than an equitable remedy. As I have concluded that plaintiffs have an adequate remedy at law under their RICO claims, Count XVII will be dismissed.[39]

---

**38.** Where as here what is being claimed is a right to restitution arising from tortious conduct, the more precise term is wrongful enrichment. "Liability in unjust enrichment has in principle nothing to do with fault. It has to do with wealth being in one person's hands when it should be in another person's." *Guyana Tel. & Tel. Co. v. Melbourne Intern.*, 329 F.3d 1241, 1245 n. 3 (11th Cir.2003), *quoting* P. Birks, *Unjust Enrichment and*

*Wrongful Enrichment,* 79 Texas L.Rev. 1767, 1789 (2001).

**39.** It is, of course, open to plaintiffs to elect the option of proceeding under a theory of unjust enrichment rather than under RICO, but that is a route that I would expect plaintiffs to forego. Even if plaintiffs, under the laws of some states, are permitted to demand both restitution and damages at law, they

## Statute of Limitations

 Defendants finally argue that all untimely claims must be dismissed on statute of limitations grounds because of plaintiffs' lack of diligence in discovering the facts underlying the Amended Complaint. The statute of limitations for a civil RICO action is four years.[40] *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The statute begins to run at the time a plaintiff knew or should have known of the injury. *Rotella v. Wood,* 528 U.S. 549, 553–554, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). "The federal doctrine of fraudulent concealment operates to toll the statute of limitations 'where a plaintiff has been injured by fraud' and 'remains in ignorance of it without any fault or want of diligence or care on his part.'" *Salois v. The Dime Savings Bank of N.Y.*, 128 F.3d 20 (1st Cir.1997) *quoting Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946)." "Irrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to exercise due diligence, and is thus charged with notice of a potential claim." *Truck Drivers & Helpers Union v. NLRB,* 993 F.2d 990, 998 (1st Cir. 1993). "To invoke the doctrine of fraudulent concealment, a plaintiff must plead and prove three elements: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.' ... The burden rests squarely on the party pleading fraudulent concealment." *Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir.1984) (internal citations omitted).

As defendants frame the issue, because the difference between the published AWP and the actual prices charged for Lupron® was a matter susceptible to discovery through reasonable investigation, plaintiffs are unable to invoke the fraudulent concealment rule. The defendants' best argument in this regard is the fact that within industry and government circles there was a generalized awareness that the AWP exceeded the actual acquisition cost for Lupron®. Plaintiffs maintain that they became aware of the injury only in 2000 when the federal government began disclosing the results of its investigation of the Lupron® marketing scheme. They might also have noted that it was only after prolonged digging with the coercive assistance of a federal grand jury that the government came to the conclusion that the price differential between the AWP and the actual cost of Lupron® to providers was of fraudulent proportions and that the doctors who had benefitted from the false billings for free samples of Lupron® would have been unlikely volunteers in any effort by plaintiffs to unearth the scheme on their own.

 Whether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue. *See Santiago Hodge v. Parke Davis & Co.,* 909 F.2d 628, 633 (1st Cir.1990) ("The determination of when appellees had knowledge of 'both the injury and its connection with the act of defendant,' is a question of fact."). *Cf. Young v. Lepone,* 305 F.3d 1, 8–9 (1st Cir.2002) (in a securities law con-

---

would not be allowed to recover cumulative or duplicative damages. *See Guyana Tel. & Tel.,* 329 F.3d at 1249; *Fox v. F & J Gattozzi Corp.,* 41 Mass.App.Ct. 581, 588–589, 672 N.E.2d 547 (1996).

**40.** The parties agree that the Massachusetts four-year limitations period for consumer protection act claims applies to all of the related state law claims. *See* M.G.L. c. 260, § 5A.

text, factual questions as to whether "storm warnings" were sufficient to put an investor on inquiry notice are only to be determined as a matter of law when the underlying facts are either admitted or undisputed). *Compare Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) (affirming a dismissal on limitations grounds where the running of the statute was apparent on the face of the complaint). While it can be fairly argued that the plaintiffs have but weakly plead facts sufficient to invoke the fraudulent concealment doctrine, they have plead enough to preclude a resolution of this issue as a matter of law at this preliminary stage of the proceedings.

## ORDER

For the foregoing reasons, the motion to dismiss is *DENIED* as to Counts I, II, and IV of the Blues' Consolidated Complaint and *ALLOWED* as to Counts III, XVI, and XVII. The motion to dismiss Counts V through XV and Counts XVIII and XIX of the Consolidated Complaint is *DENIED*. The motion to dismiss Counts I, II, V, and VI of the Class Action Complaint is *DENIED*. The motion to dismiss to Counts III, IV, VII, and VIII of the Class Action Complaint is *ALLOWED*.

SO ORDERED.